# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Miami Division

## CASE NO. 04-21917-CIV-ALTONAGA-BANDSTRA

MAKRO CAPITAL OF AMERICA, INC.,

                    Plaintiff,

          -against-

UBS AG; a/k/a UNION BANK OF
SWITZERLAND; a/k/a UBS (USA) INC.; a/k/a
UBS PAINE WEBBER; successors in interests to
assets of I.G. FARBEN AG of Germany in
Switzerland, the assets of I.G. CHEMIE AG a
shell, cloaked or alter-ego company and/or a
subsidiary, daughter, managed, controlled by I.G.
FARBEN AG; successors in interest to assets of
INTERNATIONALE INDUSTRIE-und
HANDELSBETEILIGUNGEN AG, a/k/a
INTERHANDEL, Basel a/k/a INTERNATIONAL
HOLDINGS in INDUSTRY and COMMERCE,
and UNITED STATES OF AMERICA,

                    Defendants.
_____/


## MEMORANDUM IN SUPPORT OF DEFENDANT
## UBS AG'S MOTION TO DISMISS


                              HOMER BONNER, P.A.
                              The Four Seasons Tower
                              1441 Brickell Avenue, Suite 1200
                              Miami, FL 33131

                              CLIFFORD CHANCE US LLP
                              31 West 52nd Street
                              New York, NY 10019-6131
                              (212) 878-8000

                              *Attorneys for Defendant UBS AG*

## TABLE OF CONTENTS

**Page**

Table of Authorities ..................................................................................................... ii

Introduction .................................................................................................................. 1

Background ................................................................................................................... 2

    1.   The United States Seizes the Interhandel Assets ........................................... 2

    2.   Interhandel Sues the United States ............................................................... 4

    3.   Farben Sues UBS ......................................................................................... 6

    4.   Two Historic International Settlements Occur .............................................. 7

    5.   The Swiss International Experts' Study ........................................................ 8

    6.   Makro's Directors Sue UBS ........................................................................ 9

The Complaint ............................................................................................................. 11

Argument .................................................................................................................... 11

   I.   Section 39 of the Trading With The Enemy Act and the Political Question
       Doctrine Preclude Plaintiff's Claims ........................................................... 11

   II.   Principles of International Comity Require Dismissal of the Complaint .................... 15

   III.   Plaintiff Lacks Constitutional Standing and Individual Capacity to Assert
        These Claims .............................................................................................. 17

        A.  No Constitutional Standing ................................................................. 17

        B.  No Individual Standing or Capacity ................................................... 19

   IV.   Two Historic International Settlements Preclude Claims of Nazi Era Victims .......... 20

Conclusion ................................................................................................................. 21

i

## TABLE OF AUTHORITIES

**CASES**

Arndt v. UBS AG, 342 F. Supp. 2d 132 (E.D.N.Y. 2004) ................9-11, 14, 15-16, 17-18

In re Austrian, German Holocaust Litig., 250 F.3d 156 (2d Cir. 2001) ...........................13

Baker v. Carr, 369 U.S. 186 (1962) ...................................................................................13

Bryant v. Avado Brands, Inc., 187 F.3d 1271 (11th Cir. 1999) ......................................2, 3

Falic v. Legg Mason Wood Walker, Inc., 347 F. Supp. 2d 1260 (S.D. Fla. 2004) ...........19

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) .......................................................19

Rogers v. Société Internationale Pour Participations Industrielles et
    Commerciales, S.A., 278 F.2d 268 (D.C. Cir. 1960)......................................................5

Schmitz v. Société Internationale Pour Participations Industrielles et
    Commerciales, S.A., 249 F. Supp. 757 (D.D.C. 1966)...................................................5

Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26 (1976) ...............................................19

Smith Land & Improvement Corp. v. Celotex Corp., 851 F.2d 86 (3d Cir. 1988)...........21

Société Internationale Pour Participations Industrielles et Commercielles S.A. v.
    Brownell, 225 F.2d 532 (D.C. Cir. 1955) ....................................................................4

Société Internationale Pour Participations Industrielles et Commerciales, S.A. v.
    McGranery, 111 F. Supp. 435 (D.D.C. 1953)..............................................................4

Société Internationale Pour Participations Industrielles et Commerciales, S.A. v.
    Rogers, 357 U.S. 197 (1958) ...............................................................................3, 4, 5

Stevelman v. Alias Research, Inc.,
    No. 5:91-CV-682, 2000 WL 888385 (D. Conn. June 22, 2000)..................................19

Trustees of I.G. Farben Aktionärsvereinigung, e.V. v. United States,
    No. 04 Civ. 0431, 2004 WL 251207 (S.D.N.Y. Feb. 11, 2004) .............................. 9-10

Turner Entm't Co. v. Degeto Film GmbH, 25 F.3d 1512 (11th Cir. 1994) .................15, 16

Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227 (11th Cir. 2004).......13, 14, 15, 21

United States v. Plummer, 221 F.3d 1298 (11th Cir. 2000) ..............................................14

NYA 711674.3

Univ. Creek Assoc. II, Ltd. v. Boston Am. Fin. Group, Inc.,
  100 F. Supp. 2d 1337 (S.D. Fla. 1998) ........................................................19

Warth v. Seldin, 422 U.S. 490 (1975)..............................................................17

Ziemba v. Cascade Int'l, 256 F.3d (11th Cir. 2001)........................................20

**STATUTES & OTHER AUTHORITIES**

50 U.S.C. app. § 5(b)(1)....................................................................................2

50 U.S.C. app. § 39 .............................................................................. 11-12, 17

28 U.S.C. § 1651..............................................................................................10

28 U.S.C. § 1927................................................................................................1

Decree of the Swiss Federal Council, Historical and Legal Investigation into the Fate of
  Assets which Reached Switzerland as a Result of the National-Socialist Regime:
  Appointment of the Independent Commission of Experts (Dec. 19, 1996)...................8

15 William Meade Fletcher, Cyclopedia of the Law of Private Corporations
  § 7117 (rev. perm. ed. 1983)...........................................................................21

Fed. R. Civ. P. 9(b) ........................................................................................20

Fed. R. Civ. P. 41(a)(l)(I)................................................................................11

Fed. R. Evid. 201(b)..........................................................................................2

IG Farbenindustrie AG versus Schweizerische Bankgesellschaft,
  Frankfurt am Main Oberlandesgericht (Higher Regional Court)
  decision dated Mar. 23, 1988 docket no. 9 U 80/84 .........................................6, 16, 18

IG Farbenindustrie AG versus Schweizerische Bankgesellschaft,
  Bundesgerichtshof decision dated Dec. 20, 1988,
  docket no. XI ZR 84/88 ...............................................................................7, 16

In the Matter of Trusteeship PP,
  Köln Oberlandesgericht (Higher Regional Court)
  decision dated Mar. 8, 2004, docket no. 52 VIII U 26/03 .............................................9

Mario König, Interhandel. The Swiss IG Farben holding and its Metamorphosis – a
  Question of Property and Interests (1910 – 1999) ......................................................8

NYA 711674.3

Presidential Commission on Holocaust Assets, Staff Report,
     Plunder & Restitution: The U.S. & Holocaust Victims' Assets (2000) .................2, 3, 4

Trading with the Enemy Act, ch. 106, 40 Stat. 411 (1917)
     (codified as amended at 50 U.S.C. app. §§ 1-44) ................................................ *passim*

U.S. Dep't of State, Preliminary Study: U.S. & Allied Efforts to Recover & Restore Gold
     & Other Assets Stolen or Hidden by Germany During World War II (1997)...........3, 4

Vesting Order No. 1, 4 Fed. Reg. 1046 (Feb. 17, 1942) .....................................................3

Vesting Order No. 155, 7 Fed. Reg. 7764 (Sept. 30, 1942) ................................................3

Vesting Order No. 907, 8 Fed. Reg. 2453 (Feb. 26, 1943) .................................................3

War Claims Act of 1948, ch. 826, § 12, 62 Stat. 1246 (1948)
     (codified as amended at 50 U.S.C. app. § 39(a)) .......................................................3, 4

iv

## Introduction

This is a vexatious, repetitive lawsuit that never should have been filed.[1]   Plaintiff invokes the plight of forced laborers in an effort to give their allegations an aura of legitimacy, but plaintiff in fact is asserting claims of I.G. Farben ("Farben").  Farben, as the Complaint points out, was a German company notoriously complicit with the Nazi regime.  (Compl. ¶ 14.) Makro Capital of America ("Makro"), a purported shareholder of Farben, seeks recovery for Farben of assets, shares of a U.S. company, that the United States seized as enemy property from a Swiss company (Interhandel) during World War II.

The specific issue here is whether Interhandel, since merged into UBS AG, a Swiss bank, had been a separate entity from, or simply a front for, Farben after 1940.  This issue has been litigated and relitigated for *six decades*.  The United States government relinquished some of the proceeds of the seized property to Interhandel only after (i) more than fifteen years of litigation aimed at demonstrating that Farben's fingerprints were not on the assets, and (ii) a 1964 settlement ending the protracted litigation negotiated at the highest levels of the United States and Swiss governments.  Plaintiff now seeks to undo those actions, arguing once again that the assets actually were Farben's all along, and that as such, Farben ought to get them back.

This is not the first effort on behalf of Farben to undermine the World War II-era and post-War actions of the United States government.  In the 1980's, Farben's liquidators brought a case against UBS in Germany raising issues identical to those presented here.  German courts, including the German Federal Supreme Court, ruled – after another six years of litigation – in favor of UBS on the merits.  In addition, during 2004 the sole Directors of Makro filed an action in the Eastern District of New York making allegations identical to those made here.  The Court dismissed that case on November 1, 2004.

Further, during the 1990's, class action litigations on behalf of Holocaust victims were commenced and resolved so as to provide methods of compensation for the victims.  Releases were given to UBS for itself and on behalf of Interhandel, and closure was provided to Farben and Interhandel among many others.  Finally, during the late 1990's, as part of a comprehensive review of Switzerland's role during World War II, an independent commission of international

---

[1]     See 28 U.S.C. § 1927.

historians chartered by the Swiss government again investigated the Interhandel issue in depth and again concluded Farben was wrong.  In short, the time has long passed when litigation of this issue should have stopped.

As will appear, the Complaint should be dismissed for at least three independent reasons: a Congressional prohibition and the political question doctrine bar litigation of these questions; principles of international comity preclude litigation of this case, given the judgment of the German courts dismissing the same claim; and plaintiff has no constitutional standing or individual capacity to assert these claims.

## Background

To see fully just how vexatious this lawsuit is, some discussion of its background is in order.

### 1.   The United States Seizes the Interhandel Assets

The assets at issue here originally comprised shares of General Aniline & Film Corporation ("GAF"), an American company owned prior to the Second World War by I.G. Chemie, a Swiss company subsequently known, and referred to throughout this brief, as Interhandel.  The GAF shares (hereafter "Interhandel Assets") were seized by the United States Government after the outbreak of World War II pursuant to the Trading with the Enemy Act ("TWEA"), ch. 106, 40 Stat. 411 (1917) (codified as amended at 50 U.S.C. app. §§ 1-44).  The United States asserted that Interhandel was effectively controlled by Farben and therefore, even though Interhandel was a Swiss organization, its assets had an enemy taint.

The TWEA gives the President broad powers to control most forms of trade and business transactions in times of war, including the ability to "freeze" and/or "block" foreign assets and subsequently to transfer title to ("vest") those assets in the United States.[2]  Vesting confers legal

---

[2]   50 U.S.C. app. § 5(b)(1).  See also Presidential Commission on Holocaust Assets, Staff Report, Plunder & Restitution: The U.S. & Holocaust Victims' Assets SR-43, SR-58 (2000), available at http://www.pcha.gov/PlunderRestitution.html/html/Home_Contents.html.  ("Presidential Commission Report"); U.S. Dep't of State, Preliminary Study: U.S. & Allied Efforts to Recover & Restore Gold & Other Assets Stolen or Hidden by Germany During World War II 195-96 (1997), available at http://www.state.gov/www/regions/eur/rpt_9705_ng_links.html ("Eizenstat Report").   To the extent necessary, the Court may take judicial notice of all the facts and sources cited herein, because they are either generally known, or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b); see also, e.g., Bryant v. Avado Brands,
(continued...)

NYA 711674.3

title to the property on the United States and gives it the legal authority to use the vested property for its benefit.[3]

In February 1942, the Treasury Department vested a portion of the Interhandel Assets pursuant to the TWEA, thus giving the Secretary of the Treasury legal title to those shares; and authorized the Secretary to administer, liquidate, sell or otherwise deal with the shares for the benefit of the United States.[4]  In February 1943, the remainder of the Interhandel Assets were vested.[5]  The February 1943 Vesting Order stated that the United States had determined that the previously vested Interhandel Assets were "owned by or held for the benefit of . . . I.G. Farbenindustrie, A.G." and that I.G. Farbenindustrie, A.G. was a "business enterprise [that] is a national of a designated enemy country (Germany)."[6]

Accordingly, unless it was demonstrated to be wrong, this designation of German ownership meant that all of the assets would have been permanently confiscated by the United States at the end of the War.[7]   Under no circumstance would or could the assets have been returned to the original (German) owners because Congress, through an amendment to the TWEA, expressly prohibited that result.[8]

_____

(continued...)

[  ]  Inc., 187 F.3d 1271, 1280 (11th Cir. 1999) (permitting public records to be considered at the motion to dismiss stage without conversion to summary judgment).

[3]  Such assets may be liquidated or administered by the United States.  The United States may use the proceeds of any liquidation or the profits from continued administration for its benefit.  See Presidential Commission Report at SR-58.  If a vesting order was issued and published in the Federal Register, the transfer of title was immediately and summarily effectuated.  See Presidential Commission Report at SR-59.

[4]  Vesting Order No. 1, 4 Fed. Reg. 1046 (Feb. 17, 1942).  (Declaration of Thomas Teige Carroll ("Carroll Decl.") Ex. A.)  Shares of GAF that were the subject of the February 1942 Vesting Order, together with a small number of additional shares vested in September (Vesting Order No. 155, 7 Fed. Reg. 7764 (Sept. 30, 1942) (Carroll Decl. Ex. B)), constituted approximately 97% of all outstanding shares of GAF.  See Vesting Order No. 907, 8 Fed. Reg. 2453 (Feb. 26, 1943) ("February 1943 Vesting Order") (Carroll Decl. Ex. C).  See also Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197, 198-99 (1958); Stipulation of Settlement at 2-4, Société Internationale (Interhandel-I.G. Chemie) v. Kennedy, No. 4360-48 (Dec. 20, 1963) ("Settlement") (Carroll Decl. Ex. D).

[5]  8 Fed. Reg. 2453  (Carroll Decl. Ex. C).

[6]  Id. §§ (a), (c).

[7]  As the Supreme Court later noted, not only was German ownership of the assets an issue, but also the question of whether the assets had an "enemy taint."  See 357 U.S. at 204-5.

[8]  Section 39 of the TWEA, added in 1948, makes clear that "[n]o property or interest therein of Germany, Japan, or any national of either such country vested [by the United States], shall be returned to former
(continued...)

3

2.  Interhandel Sues the United States

Following the end of the war, Interhandel sought the return of the Interhandel Assets. Interhandel commenced suit against the Attorney General and Treasurer of the United States in 1948.[9]  The action, brought under section 9(a) of the Trading With the Enemy Act, alleged that Interhandel was not an enemy or ally of an enemy under the terms of the TWEA, but a corporation from the neutral country of Switzerland.[10]

There were only two possible outcomes to this litigation: (1) if Interhandel could demonstrate that it was not an enemy national and that its assets did not have an enemy taint, it would have regained title to the Interhandel Assets from the United States;[11] or (2) conversely, if Interhandel could not demonstrate its non-enemy status, the United States would retain title to the Interhandel Assets, which would be permanently confiscated (and presumably liquidated) for the benefit of the United States.  In no event would the Interhandel Assets or their proceeds have been transferred to Farben, because of Farben's clear status as a national of a designated enemy country and the Congressional ban against the return of vested assets of such entities.  (See supra n.8.)

The government defended the action on grounds that Interhandel did not own the Interhandel Assets, and that it was an enemy within the meaning of the TWEA because it had from the time of its incorporation in 1928 conspired with Farben and others "'to conceal, camouflage, and cloak the ownership, control and domination by Farben of properties and interests located in countries, including the United States, other than Germany, in order to avoid

---

(continued...)

owners thereof or their successors in interest."  War Claims Act of 1948, ch. 826, § 12, 62 Stat. 1246 (1948) (codified as amended at 50 U.S.C. app. § 39(a)).  See also Presidential Commission Report at SR-58-60 (quoting Terminal Report, Office of the Alien Property Custodian 3-4 (Oct. 1946)); Eizenstat Report at 195-96.

[9]  Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. McGranery, 111 F. Supp. 435, 437 (D.D.C. 1953).

[10]  Id.

[11]  See Société Internationale Pour Participations Industrielles et Commerciales S.A. v. Brownell, 225 F.2d 532, 539 (D.C. Cir. 1955).  ("These cases demonstrate that Congress intended by Section 9(a) of the [TWEA] to permit any corporation of a neutral or friendly state to recover property vested under Section 5(b) if 'not an enemy or ally of enemy' or . . . 'if they could prove that they were free of any open or concealed enemy taint.'" (citation omitted).)

4

NYA 711674.3

seizure and confiscation in the event of war between such countries and Germany.'"[12]  The action spanned sixteen years in discovery and other procedural matters, and saw interventions so numerous that a special master was appointed to handle the litigation.[13]

Farben itself, though in liquidation at the time,[14] sought to intervene in 1958 through the administrators of its estate.[15]  This application was summarily denied by the district court.[16]

In April 1964, the parties settled the dispute.  The settlement comprised the auction of the Interhandel Assets and division of the proceeds between the United States and Interhandel.[17]  The settlement was a political decision involving negotiation at the highest levels of the U.S. and Swiss governments.  See, e.g., Schmitz v. Société Internationale Pour Participations Industrielles et Commerciales, S.A., 249 F. Supp. 757, 759 (D.D.C. 1966)  ("[T]he image of Interhandel was changed in United States government circles and the most influential government officials were persuaded that justice demanded the recognition of Interhandel's claim.") (describing an intermediary's efforts on behalf of Interhandel).  The dispute's resolution was undertaken by the Attorney General in person.  The United States considered the settlement to be the best solution to the question of ownership of the assets.  President Kennedy himself recognized this when asked about the settlement at a March 1963 press conference:

---

[12]  See Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197, 199 (1958) (quoting government allegations).

[13]  Rogers v. Société Internationale Pour Participations Industrielles et Commerciales, S.A., 278 F.2d 268, 270 (D.C. Cir. 1960).

[14]  After World War II, the Allies put Farben into liquidation because of its involvement in crimes against humanity.

[15]  In seeking to intervene Farben claimed that it was the actual owner of the Interhandel Assets and that it wanted to prevent Interhandel from receiving an "unlawful payment" based on the Assets.  In opposing the motion to intervene, the United States noted that Farben had not offered to provide information that would help the United States defeat Interhandel's claim and was seeking to intervene "to prevent a settlement . . . contrary to the policy favoring amicable out-of-court compromise of litigation, and [such intervention would be an] unwarranted interference, by an enemy, with the power of the Attorney General to conduct and settle suits against the United States."  Defendants' Memorandum in Opposition to Motion of Ferdinand Kremer and Walter Schmidt, et. al., for Leave to Intervene at 23, Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers, No. 4360-48 (filed Nov. 25, 1958) (Carroll Decl. Ex. E).

[16]  Order, Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers, No. 4360-48, at 1 (Dec. 19, 1958) (Carroll Decl. Ex. F).

[17]  See Settlement at 11-13 (Carroll Decl. Ex. D).

Q. Mr. President, for 20 years the Justice Department has assured Congress that it had evidence showing that Interhandel was a cover for the German firm of I.G. Farben, and therefore the seizure of General Aniline and Film in this country during World War II was justified.

Now in the past few days there has been an agreement between Justice and Interhandel on the division of the proceeds from the sale of General Aniline. Has Justice Department discovered that its facts are wrong, or has there been, or is this the result of pressure from the Swiss Government?

THE PRESIDENT. No, I would say that the agreement is an equitable agreement. It could have gone on 10 years more in the courts, and it has been now 15 or 20 years. The lawyers have enjoyed it, but I don't think that there is anything else – I don't think we would get a better arrangement if we continued the litigation for another 10 years. We feel that the arrangement which has been worked out will return the assets to those who have a claim to them, and I think the division of resources is fair.

So that I think it was the best solution.[18]

3. Farben Sues UBS

In 1983, Farben in liquidation revived the question of who owned the Interhandel Assets by commencing an action in German courts against UBS's predecessor, SBG (Schweizerische Bankgesellschaft), into which Interhandel had been merged. The ensuing drawn-out legal proceedings again concerned whether Farben effectively had controlled Interhandel after 1940, when a common interests agreement between them was terminated. Farben claimed that Interhandel was merely a front, asserting that Farben actually had created a trusteeship under which Interhandel was to administer and camouflage Farben's overseas interests and then hand them back after the War. See IG Farbenindustrie AG versus Schweizerische Bankgesellschaft, Frankfurt am Main Oberlandesgericht (Higher Regional Court) decision dated Mar. 23, 1988, docket no. 9 U 80/84, Certified Translation (Carroll Decl. Ex. H).

Following years of litigation, the Frankfurt Court of Appeals in 1988 rejected Farben's claim – *the same claim* plaintiff makes here. Id. at 2. Then, on December 20, 1988, the German Bundesgerichtshof (Federal Supreme Court) denied Farben's petition for certiorari from that

---

[18] Press Conference Dated Mar. 6, 1963, Pub. Papers, Jan. 1 to Nov. 22, 1963, at 240-241 (Carroll Decl. Ex. G).

NYA 711674.3

judgment in part because the appeal "would not have a prospect of success."[19] Remarkably, despite the obvious importance of these German proceedings (hereafter collectively the "German Action") to this case, the Complaint – prolix and allegedly historical on other subjects – does not contain *one word* about the proceedings.

4.  Two Historic International Settlements Occur

The 1990's saw the commencement of mass litigation by former victims of Nazi persecution against numerous multinational industrial and financial firms concerning their (or their predecessors') World War II-era activities.  Two settlements of unprecedented size and design addressed the moral and logistical problems raised by this phenomenon: the $1.25 billion Swiss World War II Class Action Settlement and the $5 billion German Foundation Initiative ("GFI").  Victims forced to work for Farben, for the injustices they suffered,[20] are eligible for (and presumably have received) compensation from these historic settlements.

The Swiss Bank Settlement conclusively settled three class action lawsuits brought by four broadly defined classes, that included two classes of Holocaust victims who worked as slave laborers for German industry and achieved global resolution of all World War II-era claims against Swiss banks, Swiss industry and the Swiss federal and local governments.  The GFI is a foundation achieved through an unprecedented collaboration among the German government, the U.S. government, and German industry, to provide moral and legal closure for all claims against German industry arising out of or relating to World War II.

---

[19] IG Farbenindustrie AG versus Schweizerische Bankgesellschaft, Bundesgerichtshof Decision Dated Dec. 20, 1988, docket no. XI ZR 84/88 (denying certiorari) (Carroll Decl. Ex. I).

[20] As the Complaint makes clear, Farben was among the worst of the corporate bad actors in Nazi Germany, employing slave labor and literally fueling the engines of genocide.  (See Compl. ¶¶ 14, 22.)  It borders on the inconceivable that Farben, or those who choose to invest in it, should appear before this Court, asserting the plethora of equitable remedies contained in the Amended Complaint (e.g., constructive trust, accounting), knowing full well that their hands are patently "unclean."  Indeed, plaintiff – who attempts to stand in Farben's shoes – makes perhaps the ultimate unclean hands claim when it asserts that UBS and the United States should be enjoined to produce allegedly "withheld" or "concealed" documents, so that plaintiff can establish the "purely artificial policies" (Compl. ¶ 21b) that Farben itself used to defraud the United States about its ownership of the Interhandel Assets.

5.    The Swiss International Experts' Study

In addition to all of the foregoing, the Interhandel circumstances also were investigated as one part of a broad-ranging study in Switzerland during the 1990's.  The Swiss government enacted a law in December 1996 establishing the Independent Commission of Experts ("ICE"), comprising a number of internationally renowned historians, to conduct a five-year, comprehensive review of Switzerland's role during World War II.[21]  The Interhandel part of the study, written by respected historian Mario König, concluded that Farben had terminated its control over Interhandel unconditionally in 1940:

> The decision [to terminate the common interests agreement in 1940] came just before the German military successes in Western Europe.  However the timing of the decision was determined not by the military situation but by pressure from the American authorities on the US-based properties of I.G. Chemie, to name their owners, and possible related interests.  The main concern was a possible seizure of the factories.  There is no proof that this solution was subject to a secret verbal or written proviso.  Instead, everything points to the fact that the cancellation was unconditional so as to appear more credible in the eyes of the Americans.  I.G. Farben hoped to be able to renew close relations after the war . . . .  To describe this situation as a "front" is unwarranted.  It was an open option to the future, over which I.G. Farben as a result of the course of the war, lost all control even before 1945.[22]

---

[21]    The ICE's general objective was

"to obtain the historical truth and to shed light on the extent and the fate of assets which reached Switzerland as a result of the National-Socialist regime.

Within the framework of the subject defined by the Federal Decree of 13 December 1996, an investigation is to be conducted into the role of Switzerland, particularly that of the Swiss financial center, as well as on the manner in which Switzerland dealt with this period of its history."

Decree of the Swiss Federal Council, Historical and Legal Investigation into the Fate of Assets which Reached Switzerland as a Result of the National-Socialist Regime: Appointment of the Independent Commission of Experts ¶ 1 (Dec. 19, 1996), available at www.uek.ch/en/index.htm.  The ICE is informally known as the "Bergier Commission," for the name of its chairman, Swiss historian Jean-François Bergier. Among the other historians involved were Prof. Saul Friedländer (Israel/USA); Prof. Wladyslaw Bartoszewski (Poland); Prof. Harold James (USA); and the late Prof. Sybil Milton (Holocaust Museum, Washington).

[22]    See Mario König, Interhandel. The Swiss IG Farben holding and its Metamorphosis – a Question of Property and Interests (1910 – 1999), summary, available at www.uek.ch/en/index.htm.

8

Thus, consistent with the German Action, the ICE concluded there had been a genuine break between Interhandel and Farben that was never repaired.[23]

### 6. Makro's Directors Sue UBS

In 2004 Rüdiger Beuttenmüller and Lutz Petrowsky, as Trustees of a Farben shareholders association, together with two purported shareholders of Farben, commenced an action against UBS in the Eastern District of New York.[24]  Arndt v. UBS AG, No. 04-CV-751 (ILG).  The case was assigned to Judge I. Leo Glasser.  As appears from the Amended Complaint in the Arndt case, it was substantively identical to this case, seeking precisely the same relief – return of the Interhandel Assets. (Compare, e.g., Compl.  ¶¶ 46 – 93, with Arndt complaint ¶¶ 49 – 96 (alleging identical causes of action); Carroll Decl. Ex. M.)  The purported basis for subject matter jurisdiction, however, was the Alien Tort Claims Act ("ATCA").  Claims were also made under the Torture Victims Protection Act ("TVPA").[25]

---

[23]  The ICE's final report and last seven studies and research contributions were opened to the public on Mar. 22, 2002.  Chronology of the ICE, available at www.uek.ch/en/index.htm.

[24]  Although the complaint in the Arndt case did not identify the "Trustees" by name, they were well known and identified by plaintiffs' counsel at the hearing on UBS' motion to dismiss. (Arndt v. UBS AG, 04-CV-751 (ILG)(SMG), Hearing dated July 30, 2004, Tr. at 19:25 – 20:7; Carroll Decl. Ex. J.)  Messrs. Beuttenmüller and Petrowsky are the sole Directors of Makro, the plaintiff in this case. (Carroll Decl. Ex. K.)  The other plaintiffs in the Arndt case were Andreas Arndt and Magus Verwaltungsgesellschaft mbH – both of whom have been identified as ones "who are or may be financially interested in the outcome of this case."  See, plaintiff's Certificate of Interested Persons and Corporate Disclosure Statement, filed Feb. 10, 2005 in this case.

Beuttenmüller and Petrowsky subsequently were removed from their Trustee positions by a court in Germany.  See, In the Matter of Trusteeship PP., Decision of the Köln Oberlandesgericht dated Mar. 8, 2004, docket no. 52 VIII U 26/03, Certified Translation, at 3 (revoking the appointment) (Carroll Decl. Ex. L).  The Court questioned the suitability of the Trustees.  As to Beutenmüller, the Court pointed out that he had admitted to criminal charges of falsifying balance sheet entries, id. at 7, had agreed with a U.S. law firm to pay a penalty to it if the Arndt lawsuit were terminated prior to a settlement or judgment, id. at 8, and had violated the Court's order which had enjoined commencement of the Arndt lawsuit before it was begun.  Id.  (The Cologne court, as is customary when an opinion is provided to a non-party, changed the names of the parties involved in the version made available, but their identities are clear.  As used in the opinion, "V" is UBS; the "second named party" is Beuttenmüller and the "third named party" is Petrowsky.)  Beuttenmüller and Petrowsky were succeeded by Ludwig Koch, who thereafter voluntarily moved to dismiss any claim made in the Arndt case on behalf of the Trustees.

[25]  The Arndt case actually was the second one brought by these "Trustees."  They earlier had sued the United States seeking, as here, documents relating to Interhandel.  The case was dismissed.  Trustees of I.G.
(continued...)

9

UBS immediately moved to dismiss the Arndt case as baseless.  It argued, among other things, that the court lacked subject matter jurisdiction; that the case contravened the political question doctrine; and that the case was precluded as a matter of international comity by the decision of the German courts.

While its motion to dismiss was pending, UBS learned that the duplicative Makro case had been filed before this Court, with the only difference being the asserted basis for subject matter jurisdiction.  The Makro case was filed on July 29, literally on the eve of the July 30 hearing on UBS' motion to dismiss, and was no more than a transparent effort to avoid the hearing before Judge Glasser on UBS' motion.[26]  UBS moved before the Court in the Arndt case for an order pursuant to the All Writs Act, 28 U.S.C. § 1651, enjoining further prosecution of this case and directing that it be withdrawn and refiled in the Eastern District of New York as related to Arndt.

By decision dated November 1, 2004 Judge Glasser dismissed with prejudice the claims asserted by the Farben shareholders.  The Court held that it had no subject matter jurisdiction under ATCA and that no claim was stated under TVPA.  Arndt v. UBS AG, 342 F. Supp. 2d 132, 141 (E.D.N.Y. 2004)  Judge Glasser also stated that, if subject matter jurisdiction had existed, he would have dismissed the complaint based on principles of international comity and

---

(continued...)

Farben Aktionärsvereinigung e.V. v. United States, No. 04 Civ. 0431, 2004 WL 251207 (S.D.N.Y. Feb. 11, 2004).

[26]  Counsel for plaintiffs in the Arndt case communicated with Clifford Chance US LLP by electronic mail the day before the motion to dismiss hearing, stating as follows:

"Please be advised that additional cases have been and/or are being filed.  The Arndt plaintiffs and the other plaintiffs are filing an application with the MDL to transfer and consolidate ALL actions in the Eastern District.  Given the UBS defense that Swiss Bank Settlement [sic] governs the case and/or is a basis for the case to be dismissed, and other facts we have only recently discovered or of which we have become aware, we believe the cases should be assigned to Judge Korman.   And, we believe the oral argument for tomorrow should NOT go forward and that Judge Glasser should STAY all proceedings until the MDL has decided on transfer and consolidation.

"Later today, we will be informing Judge Glasser and Judge Korman of this development and the request for a stay."

"I will be forwarding to you later today an electronic version of the MDL application, which references the new filings."

(E-mail from Fagan to Weidner dated 7/29/05; Carroll Decl. Ex. M.)  No MDL application was received, nor, so far as we are aware, was one ever filed.

10

the political question doctrine. Id. n.7. The Court in addition granted a motion that had been made by the then current Trustee of the Farben shareholder association (see, n.20 supra) voluntarily to dismiss his claim without prejudice, pursuant to Fed. R. Civ. P. 41(a)(1)(i). Id. at 136. Finally, as to UBS' motion to enjoin further prosecution of the case in this District, Judge Glasser stated pointedly:

> The Court recognizes that if Defendant is correct about the nature of the Makro suit (Plaintiffs have not opposed Defendant's motion), allowing it to proceed would unfairly expose Defendant USB [sic] (and defendant United States of America) to further expense and other courts to the wasteful dissipation of their already scarce judicial resources at the expense of parties to other lawsuits.

Id. at 142. But the Court went on to hold that, having found it lacked subject matter jurisdiction to hear the case, it also had no jurisdiction to enter the injunction UBS sought.

### The Complaint

In this diversity action, Makro, a purported shareholder of Farben, claims that the United States' seizure, and subsequent division, of the Interhandel Assets were improper. The claim – once again – is that Interhandel was simply a front during World War II for Farben, which plaintiff alleges remained the beneficial owner of the Interhandel Assets. (E.g., Compl. ¶¶ 16-17, 126-127.) Plaintiff asserts that UBS misrepresented and concealed the allegedly true ownership of the Interhandel Assets. (e.g., id. ¶¶ 17-18) and defrauded plaintiff or its predecessors in interest in the same manner. (Id. ¶¶ 64-72.) Plaintiff also alleges the United States has failed or declined to produce records plaintiff asserts would establish its claim (id. ¶ 136) and has been unjustly enriched by retaining the Interhandel Assets. (Id. ¶ 150.) Plaintiff seeks to have UBS and the United States return to Farben the total, current value of the Interhandel Assets, in order for Farben to satisfy its debts and "in part" for distribution to victims of forced labor during the Nazi era. (Id. ¶¶ 20, 72, 150-151.)

### Argument

#### I.   Section 39 of the Trading With The Enemy Act and the Political Question Doctrine Preclude Plaintiff's Claims.

Plaintiff seeks the return to Farben of the Interhandel Assets both from the United States and from UBS. Congress, however, expressly and specifically has prohibited this result through Section 39 of the TWEA. Enacted as part of the War Claims Act of 1948, Section 39 of the

11

TWEA was the United States' implementation of the Paris Reparation Agreement of 1944.  That international agreement, entered into by the United States and 17 allied nations, required each of the signatories, through such procedures as they chose, to hold or dispose of German assets under their control in such a way as "to preclude their return to German control or ownership."[27]

Section 39 thus provides that "no property or interest therein of [any German national] … vested [by the United States] shall be returned to former owners thereof or their successors in interest."  50 U.S.C. app. § 39(a).  It applies directly to the Interhandel Assets, as the US Treasury Department designated Farben a "national of a designated enemy country (Germany)" and vested the Interhandel Assets in 1942-1943.  See supra at 3.  Farben and other German interests were well aware of the impact of Section 39 of the TWEA.  Coordinated by a former director of Farben, German interests repeatedly lobbied Congress during the 1950's to repeal the section 39 prohibition.[28]  Congress rejected those efforts.  Section 39 continues to embody fundamental foreign policy of the United States and precludes the result plaintiff seeks.

Indeed, this entire case is at bottom a dispute over policy questions resolved at the highest level of the United States and other governments.  The whole Interhandel question owes its very existence to the policies and actions of the executive and legislative branches of the US government.  The dispute over ownership of the Interhandel Assets arose because the Executive Branch decided during World War II to vest them with the Treasury Department under the TWEA and because, as discussed above, Congress in furtherance of US foreign policy mandated that in no circumstance were such assets to be returned to German control.  The dispute then became the subject of substantial diplomatic negotiation between the United States and Swiss governments.  (Compl. ¶ 121.)  The 1964 settlement of the Interhandel suit was the political decision of the Justice and other departments of the US Executive Branch, involving the Attorney General and, ultimately, the President.  (See supra at 5-6; Compl. ¶ 123.)

This case then is nothing short of yet another effort to have a court second-guess carefully considered U.S. foreign policy concerning both the seizure and the disposition of the

---

[27]   See, Return of Confiscated Property:  Hearings on S. 411, S. 600, S. 727 and S. 1302 Before the Subcomm. to Examine and Review the Administration of the Trading With the Enemy Act of the Senate Comm. on the Judiciary, 85th Cong. 47 (1957) (statement of Sen. Smathers) at 47; Carroll Decl. Ex. O.

[28]   Id. at 83.

NYA 711674.3

Interhandel Assets.[29]   Plaintiff's demand that the government declassify a wide range of executive and military documents simply underscores this objective.[30]   Entertaining a revival now of those issues, as plaintiff seeks to do, necessarily would involve an improper review of policies the Executive has examined and settled.

This case thus squarely raises nonjusticiable political questions and accordingly contravenes the political question doctrine.   That doctrine is based on the proper relationship between the judiciary and the other branches of the government.   Baker v. Carr, 369 U.S. 186, 217 (1962).   Courts refuse to adjudicate a claim where, among other things there exists:

> the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;   or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made;   or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Id.

The political question doctrine precludes "judicial intervention in policy areas reserved to the political branches."   Ungaro–Benages v. Dresdner Bank AG, 379 F.3d 1227, 1235 (11th Cir. 2004).   See also, e.g., In re Austrian, German Holocaust Litig., 250 F.3d 156, 163-164 (2d Cir. 2001) ("the doctrine of separation of powers prohibits the federal courts from excursions into areas committed to the Executive Branch or the Legislative Branch").   This should be

---

[29]   (See Compl. ¶ 10 (alleging that "[a]t various times, the Swiss Confederation made legal and diplomatic claims that the [Interhandel Assets] be returned."); id. ¶ 121 (acknowledging that after World War II, decisions regarding GAF assets were the product of "lengthy negotiations…involving almost every branch of the US Government and certain officials from the Swiss Government"); id. ¶¶ 147-48 (alleging that the U.S. government acted wrongly with regard to GAF assets); id. ¶¶ 139, 143 (admitting that plaintiff needs classified documents that it does not have to "prove the claims against UBS" and seeking to force the U.S. government to declassify broad categories of documents).)

[30]   (Compl. ¶ 143.)   The documents include "all documents from the offices of the President, the Attorney General, the Secretary of State, the Secretary of Defense, the Secretary of the Treasury, the Office of Military Government U.S. in Europe (OMGUS), the Office of Special Investigations." (Id. ¶ 143(b).) Many of the record collections plaintiff seeks have been declassified since the writing of the Eizenstat Report, and the remainder continue to be declassified though the ongoing work of an interagency task force.  Eizenstat Report at iii (Foreword/Introduction).   Also included in plaintiff's request are "Executive Reports, diplomatic notes, Work Product, Internal memos and/or other records related to the U.S.' litigation, negotiations, discussions and ultimate settlement" of the Interhandel case in 1964. (Id. ¶ 143(d).) One might wonder what new documents plaintiff expects to find in these files, because any contemporaneous documents that conclusively support plaintiff's allegation that Interhandel was German-owned presumably would have been used by the U.S. government in the litigation half a century ago to prove this very point and allow it to keep all of the Interhandel Assets.

NYA 711674.3

particularly so concerning decisions, as here, taken pursuant to the TWEA.   As the Court of Appeals has recognized:

> The authority delegated by Congress to the President under the TWEA is extensive.   '[B]oth the legislative history and cases interpreting the [Act] fully sustain the broad authority of the Executive when acting under this congressional grant of power.'  The delegation of such broad powers to the President is consistent with the President's constitutionally vested role as the nation's authority in the field of foreign affairs.

United States v. Plummer, 221 F.3d 1298, 1309 (11th Cir. 2000) (citing and quoting Dames & Moore v. Regan, 453 U.S. 654, 672 (1981)).

Equally significant, this case calls into question the settlement of the Interhandel case in 1964.  The Eleventh Circuit has pointed out that the political question doctrine precludes further litigation over matters settled, as here, by the President.  In a case, unlike this one, in which the President had not settled the relevant claim, the Court of Appeals explained that, "[t]he President could have settled these cases.   In that case, federal courts would be interfering with the executive's conduct of foreign relations if we continued to exercise jurisdiction."   Ungaro–Benages, 379 F.3d at 1237.  For just this reason, in ruling on plaintiff's prior attempt to relitigate the Interhandel matter, Judge Glasser stated that if subject matter jurisdiction had existed he would have dismissed the case pursuant to the political question doctrine:

> Further, since the executive branch of the United States government, including the Attorney General and President, were involved in, and approved, the settlement of the same claims which Plaintiffs advance here, see Schmitz v. Societe Internationale Pour Participations Industrielles et Commericales, S.A., 249 F.Supp. 757, 759 (D.D.C. 1966), cert. denied, 387 U.S. 908 (1967), the political question doctrine would also preclude Plaintiffs' claims and warrant dismissal of the Amended Complaint.  See, e.g., Greenburg v. Bush, 150 F.Supp.2d 447, 454 & n. 4 (E.D.N.Y. 2001) ("It is wholly inappropriate for the judicial branch to question 'a political decision already made'") (citing and quoting Baker v. Carr, 369 U.S. 186, 217 (1962)).

Arndt, 342 F. Supp. 2d 132 n.7.

In sum, the issues raised in this lawsuit have been debated repeatedly and resolved by multiple agencies of the Executive Branch as well as by Congress.  For this reason alone, the complaint should be dismissed.

14

## II.   Principles of International Comity Require Dismissal of the Complaint

The German Action resolved the same issues, between the same parties, over 16 years ago.   The highest German court conclusively rejected Farben's claims of ownership of the Interhandel Assets.   (See supra at 6-7.)   This action therefore should be dismissed in deference to the German Action under principles of international comity.

Courts will defer to foreign judgments where the foreign court was competent and used proceedings consistent with civilized jurisprudence, where the judgment was not rendered by fraud, and where the judgment does not violate U.S. public policy notions of what is decent and just.   See, e.g., Ungaro-Benages, 379 F.3d at 1238 (dismissing diversity claims to recover assets stolen by the Nazi regime on grounds of international comity).   The Eleventh Circuit has recognized that comity is especially relevant to cases like this one: "[i]nternational comity serves as a guide to federal courts where 'the issues to be resolved are entangled in international relations.'"   Id. at 1237 (quoting In re Maxwell Communication Corp., 93 F.3d 1036, 1047 (2d Cir. 1996)).[31]   Indeed,

> once a judgment on the merits is reached in one of the cases, as in the German forum in this case, failure to defer to the judgment would have serious implications for the concerns of international comity.   For example, the prospect of 'dueling courts,' conflicting judgments, and attempts to endorse conflicting judgments raise major concerns of international comity.

Turner Entm't Co. v. Degeto Film GmbH, 25 F.3d 1512, 1521 (11th Cir. 1994).

These principles counsel judicial abstention here in light of the German Action.   Indeed, in the Arndt case, Judge Glasser said that if subject matter jurisdiction had existed he also would have dismissed these claims on the basis of international comity:

> As noted above, in 1988, the Frankfurt Court of Appeals rejected the very same claims that Farben asserts in this case that it litigated in Germany.... The German Supreme Court denied Farben's petition for certiorari from the judgment of the Frankfurt Court of Appeals.... Under well established Second Circuit case law, "American courts will normally accord considerable deference to foreign

---

[31]   In cases involving foreign relations federal law governs comity analysis, even in actions premised on state law claims.   Ungaro-Benages, 379 F.3d 1227 at 1238 ("Because our foreign relations could be impaired by the application of state laws, which do not necessarily reflect national interests, federal law applies to these cases even where the court has diversity jurisdiction").

15

adjudications as a matter of comity." See, e.g., Diorinou v. Mezitis, 237 F.3d 133, 142 (2d Cir. 2001).

Arndt, 342 F. Supp. 2d 132 n.7.

There is no doubt as to the jurisdiction and competence of the German courts, as this Circuit has recognized. Turner Entm't, 25 F.3d at 1520 ("Germany's legal system clearly follows procedures that ensure that litigants will receive treatment that satisfies American notions of due process."). The German decision was first pronounced by the court of general jurisdiction on the merits of the case, and this lower court judgment worked its way through the appellate system until the highest court of the land denied review of the question. See IG Farbenindustrie AG versus Schweizerische Bankgesellschaft, Frankfurt am Main Oberlandesgericht Decision dated Mar. 23, 1988, docket no. 9 U 80/84, Certified Translation, at 2 (Carroll Decl. Ex. H); IG Farbenindustrie AG versus Schweizerische Bankgesellschaft, Bundesgerichtshof Decision dated Dec. 20, 1988, docket no. XI ZR 84/88, Certified Translation (denying certiorari) (Carroll Decl. Ex. I).

The German Action provided Farben with the opportunity to litigate the issue of its ownership of the Interhandel Assets fully and fairly, for over six years. The question of insufficiency of evidence was raised and addressed by the lower court in the German Action, which stated that there was no relevance between the theory raised by Farben and the difficulty of obtaining certain documents from the Swiss government. IG Farbenindustrie AG versus Schweizerische Bankgesellschaft, Frankfurt am Main Oberlandesgericht Decision dated Mar. 23, 1988, docket no. 9 U 80/84, Certified Translation, at 58 (Carroll Decl. Ex. H). Further, König's detailed and independent review of the matter concluded that the link between Farben and Interhandel was severed: "everything points to the fact that the cancellation was unconditional so as to appear more credible in the eyes of the Americans. I.G. Farben hoped to be able to renew close relations after the war. . . . To describe this situation as a front is unwarranted." (See supra at 8-9.)

Finally, no U.S. domestic public policy will be violated by deferring to the judgment rendered in the German Action – the United States settled its claim concerning these assets with Interhandel 40 years ago, executing its policy with regard to this issue in 1964. To the contrary, failure to grant comity in this case actually would contravene the policies expressed by the Legislative and Executive Branches in the TWEA and Interhandel settlement respectively: that

16

none of the Interhandel Assets be turned over to Farben at all, 50 U.S.C. app. § 39(a), and that a portion of the Interhandel Assets should be turned over to Interhandel, to which UBS has succeeded.

The Complaint should be dismissed for this reason, too.

**III.    Plaintiff Lacks Constitutional Standing and Individual Capacity to Assert These Claims**

A.    <u>No Constitutional Standing</u>

Plaintiff has no standing to bring these claims against UBS because the claims belonged, if to anyone, to the United States, which relinquished them through the 1964 settlement. Article III of the Constitution requires that a plaintiff "allege a distinct and palpable injury to himself" in order to have standing. <u>Warth</u> v. <u>Seldin</u>, 422 U.S. 490, 501 (1975). Further, the Supreme Court has made clear as a prudential matter that a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." <u>Id.</u> at 499. In this case, plaintiff neither alleges a distinct and palpable injury to itself nor demonstrates that it is asserting its own rights and interests.

As discussed above, the United States government seized the Interhandel Assets pursuant to the TWEA and "vested" them pursuant to it. The assets thereby became the property of the United States. The basis asserted for the United States seizure was that Interhandel, despite having been separated in 1940 from Farben, nevertheless effectively remained under its control. Interhandel, as well as other Swiss interests, including the Swiss government, strongly disputed the claim in the suit against the United States to reclaim the assets. After years of highly-charged and much-publicized litigation, the U.S. government eventually determined to settle the action; the Interhandel Assets were auctioned and the proceeds were split between the United States and Interhandel.

Perversely, plaintiff now claims that the Interhandel Assets really were controlled/owned by Farben and seeks on that basis to have those assets turned over to Farben. (<u>E.g.</u>, Compl. ¶¶ 16, 20.) But if the assets actually had belonged to Farben, as plaintiff now claims, the assets would be the property of the United States. As Judge Glasser observed in dismissing the <u>Arndt</u> action:

NYA 711674.3

> [I]f Plaintiffs are correct that UBS's predecessor was controlled by Farben after 1940, including during World War II—the issue litigated in the United States for sixteen years beginning in 1948—the Interhandel Assets which Plaintiffs claim should be rightfully returned to them for distribution to Holocaust survivors, would be the property of the United States, which had seized them initially for just that reason.

Arndt, 342 F. Supp. 2d 132 n.6.  The appellate court in the German Action made the same point in its 1988 decision dismissing Farben's claim against UBS for a share of the Interhandel Assets. According to the court, Farben failed to show that Interhandel had remained under Farben's control after 1940 and therefore was not entitled to any recovery.  The appellate court went on to say that:

> [t]he plaintiff [Farben] has not sustained a loss in connection with the termination of the common interests agreement and the later settlement [between Interhandel and the U.S.].  If the common interests agreement had not been terminated, the situation under the trading with the enemy legislation of the U.S. would have been so clear that it [Interhandel] could not have received any proceeds from the settlement.  The plaintiff [Farben], through the termination agreement, if at all, could only have paved the way for Interhandel to achieve an unjustified enrichment to the detriment of the U.S., if its [Farben's] contentions were true that the relations had not been truly severed by the termination agreement.
>
> It follows that the result of this decision is not unreasonable.  The plaintiff has sustained no loss.[32]

In short, if plaintiff is correct that the Interhandel Assets really belonged to Farben, by establishing that fact, plaintiff proves itself out of court:  if the assets were Farben assets, then the assets unquestionably, properly and conclusively were vested in the United States, which thereafter had the sole claim to them.  Conversely, if Interhandel's position was correct, that after 1940 it was truly independent of Farben ownership or enemy taint and therefore was entitled under the TWEA to have the Interhandel Assets restored, Interhandel thereafter would have the

---

[32]   IG Farbenindustrie AG versus Schweizerische Bankgesellschaft, Frankfurt am Main Oberlandesgericht Decision dated Mar. 23, 1988, docket no. 9 U 80/84, Certified Translation, at 57 (Carroll Decl. Ex. H); see also id. at 50 ("Interhandel's prime objective was (naturally) to obtain the release of the GAF shares, which, incidentally, was something [Farben] would definitively not have been able to achieve."); id. at 53 ("Had [Farben] and Interhandel made any express provisions benefiting [Farben], this would have destroyed all hopes of avoiding that the GAF shares would be confiscated."); id. at 34-35 (testimony "that Interhandel was subject to a fiduciary obligation to hold or recover the GAF participations on [Farben's] behalf . . . would have been more than enough to set a seal on the loss of GAF.").

sole claim to them – obviously a factor important to the United States' 1964 settlement with Interhandel. Either way, Farben had, and has, no claim to the assets.

Thus having itself "sustained no loss," as the appellate court in the German Action succinctly put it, Farben and those claiming on its behalf possess no right that has been impaired and therefore no standing to assert the claims they attempt to make here.[33] This case should be dismissed. Indeed, basic logic would compel this result as well: any rationale that would permit Farben – an admitted former enemy combatant to the United States in World War II – or its representatives now to obtain title to assets the United States had seized during World War II as a result of that very enemy combatant status would, we submit, reach the ludicrous.

B.      No Individual Standing or Capacity

Plaintiff also lacks individual standing or capacity to assert claims against UBS. Makro alleges it is a shareholder of Farben. (Compl. ¶ 23.) The claim it purports to assert, for return of the Assets that allegedly belong to Farben, can only be asserted by Farben, the corporate entity. It is clear beyond question that "the proper party to bring a claim on behalf of a corporation is the corporation itself. ...   This general rule is applicable even where the individual is the sole shareholder of the corporation." Falic v. Legg Mason Wood Walker, Inc., 347 F. Supp. 2d 1260, 1270 (S.D. Fla. 2004) (dismissing shareholders' claims where claim belonged to the corporation). Makro's alleged share ownership plainly is not enough to give it standing to bring Farben's claim. Id.

Makro also makes a vague reference to some kind of assignment of the rights it asserts. (Compl. ¶ 26.) Even assuming the existence of such an assignment, "'[t]he assignee steps into the shoes of the assignor and is subject to all equities and defenses that could have been asserted against the assignor had the assignment not been made.'" Univ. Creek Assoc. II, Ltd. v. Boston Am. Fin. Group, Inc., 100 F. Supp. 2d 1337, 1341 (S.D. Fla. 1998) (quoting State v. Family

---

[33] For the same reason, plaintiff cannot meet the "traceability" requirement for Article III standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (Injury must be traceable to conduct complained of); Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976). Even assuming UBS and the United States withheld documents showing Farben's ownership of Interhandel, as plaintiff asserts, those actions caused no harm to plaintiff; the documents would simply have established that the assets had been properly seized by the United States, eliminating any possible claim by Farben to the assets. This is insufficient to afford plaintiff standing. E.g., Stevelman v. Alias Research, Inc., No. 5:91-CV-682, 2000 WL 888385, at *7 (D. Conn. June 22, 2000) (loss claimed not traceable to alleged fraudulent conduct).

NYA 711674.3

Bank of Hallandale, 667 So.2d 257 (Fla. Dist. Ct. App. 1995)). Therefore, even if Makro could stand in Farben's shoes, it would face the same problems, discussed above, that bar Farben's own claim. Again, these claims should be dismissed.[34]

## IV. Two Historic International Settlements Preclude Claims of Nazi Era Victims

Plaintiff attempts to wrap itself in the mantle of forced labor victims, (e.g., Compl. ¶ 20, 26) even though that is not who plaintiff is. Assuming plaintiff *were* a Nazi victim rather than a collaborator, however, its claims also would be barred by the resolutions of prior actions.

First, the Swiss World War II Class Action Settlement would preclude this action. That Settlement provides that class members who performed slave or forced labor for Farben released the claims asserted in this case. The "Releasees" who benefit from the release in that case are defined expressly to include defendant UBS AG, as well as Interhandel.[35] The "Settling Plaintiffs" who are bound by the foregoing release include Farben slave and forced laborers.[36] The release that Farben laborers, as Settling Plaintiffs, granted to UBS AG (itself and as successor to Interhandel) as Releasees, covers all "Claims," a term that is defined broadly to include all of the claims asserted in the instant suit.[37]

---

[34] The Complaint also fails to satisfy even the basic requirements of Fed. R. Civ. P. 9(b), which requires claims of fraud and misrepresentation to be pled with particularity. See, e.g., Ziemba v. Cascade Int'l, 256 F.3 1194, 1202 (11th Cir. 2001) (Rule 9(b) requires, inter alia, "precise" recital of representations or omissions alleged, the time and place of each such statement and the person responsible, the content of such statements and the manner in which they misled the plaintiff).

The Complaint speaks only in glittering generalities. Unidentified "newly discovered documents," plaintiff repeatedly avers, supposedly show that UBS and the United States withheld documents and misled others. (E.g., Compl. ¶¶ 15-22.) Not only are the documents completely unspecified, but no facts showing the when, what, who and how of the alleged misrepresentations are alleged. (See, e.g., Compl. ¶¶ 68, 74–77, 79.) This complaint constitutes exactly the kind of blunderbuss pleading that Rule 9(b) is meant to preclude. "The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." Ziemba, 256 F.3d at 1202 (emphasis added)(quotations and citations omitted).

[35] See Swiss WWII Class Action Settlement § 1, available at http://www.swissbankclaims.com/index.asp.

[36] See id. § 8.2.

[37] See id. § 1.

Second, the claims asserted here would fall within the scope of the GFI's mandate as "the exclusive remedy and forum for the resolution of all claims that have been or may be asserted against German companies arising from the National Socialist era and World War II."[38] Farben's one-time Swiss affiliate, Interhandel, is a "German company," as that term is defined under the GFI, because it was owned during a part of the relevant period by a German parent.[39] And, because plaintiffs bring their claims against UBS in its capacity as successor in interest to the assets of Interhandel, (e.g., Compl. caption), it too is a "German company" for these purposes.[40] Finally, Farben forced and slave laborers are eligible for distributions from the GFI. The Eleventh Circuit has made clear that claims for recovery of property by victims of the Nazi era are precluded by principles of international comity to the GFI when the U.S. has filed a statement of interest in a case, as almost surely would be the circumstance here had this case truly been brought by Nazi era victims. Ungaro-Benages, 379 F.3d 1239 – 41.

## Conclusion

Purported representatives of Farben here once again seek to subvert fundamental U.S. foreign policy. Representatives of Farben, one of the worst of the Nazi collaborators, have sought this result for decades. They have been completely unsuccessful in each of their efforts:

- Farben representatives lost in their effort to intervene in the U.S./Interhandel litigation and prevent the settlement that allocated the Interhandel Assets.[41]

---

[38] See Agreement between the Government of the Federal Republic of Germany and the Government of the United States of America concerning the Foundation "Remembrance, Responsibility and the Future" (July 17, 2000), art. 1§ 1, available at http://www.state.gov/www/regions/eur/holocaust/000717_agreement.html ("GFI Agreement").

[39] See GFI Agreement, Annex C, (2) (A "German Company" includes "[e]nterprises situated outside the 1937 borders of the German Reich in which during the period between January 30, 1933, and the entry into force of the legislation establishing the [GFI], German enterprises as described [above] had a direct or indirect financial participation of at least 25 percent"). Plaintiffs contend that Farben controlled Interhandel during all of the relevant period. Although, if necessary, UBS (based on the German Action, the U.S. settlement and the findings of the International Historical Commission) will contest this allegation, it does not contest that for a portion of the period (prior to 1940) Farben did control Interhandel.

[40] See 15 William Meade Fletcher, Cyclopedia of the Law of Private Corporations § 7117 (rev. perm. Ed. 1983) (a successor company "is entitled to avail itself of the same defenses as were available to the old companies"); Smith Land & Improvement Corp. v. Celotex Corp., 851 F.2d 86, 91 (3d Cir. 1988) (same).

[41] Supra at 5.

NYA 711674.3

- Farben representatives lost in their lobbying efforts during the 1950's to convince Congress to repeal Section 39, which bars return of the Interhandel Assets.[42]

- Farben representatives lost in their effort to end run Section 39 and obtain the Interhandel Assets through litigation against UBS in the German courts.[43]

- Farben representatives lost in their effort to regain the Interhandel Assets through the New York litigation.[44]

Now, they come into this Court and ask that it use *its* resources to order what Congress, following U.S. foreign policy, flatly has prohibited and what the courts of the United States and of Farben's own country repeatedly have rejected.  This Court should put an end to this case and make clear that litigation concerning this issue should have been, and now is, *over*.

Dated: February 17, 2005

HOMER BONNER, P.A.

By:  _Gregory Trask_

    Peter Homer, Esq.
    Florida Bar No. 291250
    Gregory J. Trask, Esq.
    Florida Bar No. 0055883

The Four Seasons Tower
1441 Brickell Avenue, Suite 1200
Miami, FL 33131
(305) 351-5100
(305) 372-2738 fax

James B. Weidner, Esq.
Thomas Teige Carroll, Esq.
Amber Wessels, Esq.
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019-6131
(212) 878-8000
(212) 878-8375 fax

*Attorneys for Defendant UBS AG*

---

[42]   Supra at 12.

[43]   Supra at 6-7.

[44]   Supra at 9-11.

NYA 711674.3

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served this 17th day of February 2005 by hand delivery upon the following:

Steve I. Silverman, Esq.
Kluger, Peretz, Kaplan & Berlin
The Miami Center, Suite 1700
201 South Biscayne Blvd.
Miami, Florida 33131
(305) 379-3428 fax

Norman Hennings, Esq.
Assistant United States Attorney
United States Attorney's Office
Southern District of Florida
99 N.E. 4th Street
Miami, Florida 33132
(305) 530-7679 fax

_____
Gregory J. Trask